UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>(1)  WEMERSON DUTRA AGUIAR,<br>(2)  PRISCILA BARBOSA,<br>(3)  EDVALDO ROCHA CABRAL,<br>(4)  CLOVIS PLACIDO,<br>(5)  BRUNA PEIXOTO COLAÇO<br>     RAMOS,<br>(6)  GUILHERME DA SILVEIRA,<br>(7)  THIAGO DE SOUZA PRADO,<br>(8)  LUIZ NARCISO ALVES NETO,<br>(9)  FLAVIO CANDIDO DA SILVA,<br>(10) ALTACYR DIAS GUIMARAES<br>     NETO,<br>(11) ITALLO FELIPE PEREIRA DE<br>     SOUSA CORREA,<br>(12) JULIO VIEIRA BRAGA,<br>(13) PHILIPE DO AMARAL<br>     PEREIRA,<br>(14) BRUNO PROENCIO ABREU,<br>(15) OLIVER FELIPE GOMES DE<br>     OLIVEIRA,<br>(16) ALESSANDRO FELIX DA<br>     FONSECA,<br>(17) WALDEMY JORGE LIMA<br>     WANDERLEY JUNIOR, and<br>(18) SAULO AGUIAR PONCIANO<br><br>         Defendants | Criminal No. 1:21-cr-10158-MLW<br><br>Violation:<br><br>Count One: Conspiracy to Commit Wire Fraud<br>(18 U.S.C. § 1349)<br><br>Counts Two-Three: Aggravated Identity Theft<br>(18 U.S.C. § 1028A(a)(1))<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 981(a)(1)(C) and<br>28 U.S.C. § 2461) |

<u>SUPERSEDING INDICTMENT</u>

At all times relevant to this Superseding Indictment:

<u>General Allegations</u>

1.      Defendant WEMERSON DUTRA AGUIAR was a Brazilian national residing in Lynn, Massachusetts and Woburn, Massachusetts.

2.      Defendant PRISCILA BARBOSA was a Brazilian national residing in Saugus, Massachusetts.

3.      Defendant EDVALDO ROCHA CABRAL was a Brazilian national residing in Lowell, Massachusetts.

4.      Defendant CLOVIS KARDEKIS PLACIDO was a Brazilian national residing in Citrus Heights, California.

5.      Defendant BRUNA PEIXOTO COLAÇO RAMOS was a Brazilian national residing in Burlington, Massachusetts.

6.      Defendant GUILHERME DA SILVEIRA was a Brazilian national residing in Revere, Massachusetts.

7.      Defendant THIAGO DE SOUZA PRADO was a Brazilian national residing in Revere, Massachusetts.

8.      Defendant LUIZ NARCISO ALVES NETO was a Brazilian national residing in Revere, Massachusetts.

9.      Defendant FLAVIO CANDIDO DA SILVA was a Brazilian national residing in Revere, Massachusetts.

2

10.     Defendant ALTACYR DIAS GUIMARAES NETO was a Brazilian national residing in Kissimmee, Florida.

11.     Defendant ITALLO FELIPE PEREIRA DE SOUSA CORREA was a Brazilian national residing in Daly City, California.

12.     Defendant JULIO VIEIRA BRAGA was a Brazilian national residing in Daly City, California.

13.     Defendant PHILIPE DO AMARAL PEREIRA was a Brazilian national residing in Hercules, California.

14.     Defendant BRUNO PROENCIO ABREU was a Brazilian national residing in Saugus, Massachusetts.

15.     Defendant OLIVER FELIPE GOMES DE OLIVEIRA was a Brazilian national residing in Shrewsbury, Massachusetts.

16.     Defendant ALESSANDRO FELIX DA FONSECA was a Brazilian national residing in Revere, Massachusetts.

17.     Defendant WALDEMY JORGE LIMA WANDERLEY JUNIOR was a Brazilian national residing in Watertown, Massachusetts.

18.     Defendant SAULO AGUIAR PONCIANO was a Brazilian national residing in Wheeling, Illinois.

19.     Co-Conspirator 1 ("CC-1"), an individual known to the Grand Jury, was a Brazilian national residing in Malden, Massachusetts, Maitland, Florida, and Brazil.

3

20.     Co-Conspirator 2 ("CC-2"), an individual known to the Grand Jury, was a Brazilian national residing in Saugus, Massachusetts, Orlando, Florida, and Brazil.

<u>Other Relevant Entities</u>

21.     Rideshare Company A was a ride-hailing company with offices in San Francisco, California that connected drivers with riders via a mobile phone application ("app").

22.     Delivery Company B was an online food ordering and delivery service with offices in San Francisco, California that connected customers with restaurants via a mobile phone app or website.

23.     Rideshare Company C was a ride-hailing company with offices in San Francisco, California that connected drivers with riders via a mobile phone app.

24.     Delivery Company D was an online food ordering and delivery service with offices in San Francisco, California that connected customers with restaurants via a mobile phone app or website.

25.     Delivery Company E was an online grocery delivery and pick-up service with offices in San Francisco, California.

26.     Collectively, Rideshare Company A, Delivery Company B, Rideshare Company C, Delivery Company D, and Delivery Company E are referred to herein as the "Rideshare/Delivery Companies."   Delivery Company B, Delivery Company D, and Delivery Company E are referred to collectively as the "Delivery Companies."

<u>General Background on the Rideshare/Delivery Companies</u>

27.     Each of the Rideshare/Delivery Companies sets minimum qualifications for drivers.   Among other things:

    a.   Rideshare Company A required applicants to be at least 21 years old, have at least one year of driving history—or three years if under the age of 23—and pass a motor vehicle and criminal background check.

    b.   Delivery Company B required applicants applying to deliver via automobile to be at least 18 years old, have at least one year of driving history, and pass a motor vehicle and criminal background check.

    c.   Rideshare Company C required applicants to be at least 25 years old, possess a valid driver's license, Social Security number, and vehicle insurance, have at least one year of driving history, and pass a motor vehicle and criminal background check.

    d.   Delivery Company D required applicants applying to deliver via automobile to be at least 18 years old, have a valid Social Security number, and pass a motor vehicle and criminal background check.

    e.   Delivery Company E required applicants applying to deliver via automobile to be at least 18 years old and pass a motor vehicle and criminal background check.

28.     Applicants seeking to drive for the Rideshare/Delivery Companies submitted their information, including their names, dates of birth, Social Security numbers, and driver's license information, via the Rideshare/Delivery Companies' websites or mobile phone apps.

29.     Each of the Rideshare/Delivery Companies used a third-party company to complete the motor vehicle and criminal background check on driver applicants.   This company ran the motor vehicle and criminal background check based on the name, date of birth, and Social Security number each of the applicants provided.

30.     Drivers applying to drive for rideshare companies in Massachusetts were also required to pass a separate background check run by the Massachusetts Department of Public Utilities ("DPU").   The DPU ran its check based on the name, date of birth, driver's license number, and last six digits of the Social Security number provided by each driver applicant. The DPU completed a follow-up background check on all Rideshare Company A and Rideshare Company C drivers in Massachusetts every six months based on this same information.

31.     The Rideshare/Delivery Companies occasionally offered referral bonuses depending on market conditions.   To earn a referral bonus, existing drivers who were in good standing could refer another person to become a driver for the company.   Once the referred driver completed a set number of trips, which varied by company and market, the referring driver (and, at some companies, the referred driver) could earn a bonus.   The amount of the bonus depended on the company and the market and could be greater than $1,000.

### Overview of the Conspiracy and the Scheme to Defraud

32.     Beginning by at least January 2019 and continuing through at least April 2021, in the District of Massachusetts and elsewhere, the defendants conspired with one another and with others known and unknown to the Grand Jury to create fraudulent driver accounts with Rideshare/Delivery Companies, and to rent or sell the accounts to individuals who might not otherwise qualify to drive for those services.

### Object and Purposes of the Conspiracy

33.     The principal object of the conspiracy was to commit wire fraud, in violation of Title 18, United States Code, Section 1343, by, among other things, creating fraudulent driver accounts with Rideshare/Delivery Companies, and renting or selling the accounts to individuals who might not otherwise qualify to drive for those services, in order to obtain money and property.   The principal purposes of the conspiracy were to enrich the defendants and to conceal their conduct from the Rideshare/Delivery Companies, from law enforcement, and from individual victims' whose personal identifiers were used to open the fraudulent driver accounts.

### Manner and Means of the Conspiracy

34.     Among the manner and means by which the defendants and coconspirators known and unknown to the Grand Jury carried out the conspiracy were the following:

> a.   Obtaining images of victims' driver's licenses, or the information on victims' driver's licenses, and Social Security Numbers, from various sources including the DarkNet;

b.  Editing images of driver's licenses, insurance documents, and other materials to submit to the Rideshare/Delivery Companies to create fraudulent accounts;

c.  Creating fraudulent accounts to drive for the Rideshare/Delivery Companies using those stolen identifiers;

d.  Renting or selling those accounts, including to people who might not otherwise qualify to drive for the Rideshare/Delivery Companies;

e.  Coordinating with one another on prices charged to rent and sell accounts;

f.  Sharing tips about how to circumvent the Rideshare/Delivery Companies' fraud detection systems;

g.  Causing the Rideshare/Delivery Companies to generate Internal Revenue Service Forms 1099 in the names of the identity theft victims for income they never earned, and attempting to divert those Forms 1099 from being sent to the victims;

h.  Collecting referral bonuses from the Rideshare/Delivery Companies by submitting additional fraudulent driver accounts;

i.  Utilizing global positioning system ("GPS") "spoofing" applications to "cut the line" for rides or deliveries, or to make it appear that trips were longer than they actually were, in order to obtain additional fares and increased fares from the Rideshare/Delivery Companies, and selling this technology to drivers; and

j.  Utilizing software applications that run automated tasks over the Internet—known as "bots"—and other applications to obtain additional orders from the Delivery Companies, and selling this technology to drivers.

<u>Acts in Furtherance of the Conspiracy</u>

35.    On various dates beginning no later than in or about January 2019 through in or about April 2021, the defendants and others known and unknown to the Grand Jury committed and caused to be committed the following acts, among others, in furtherance of the conspiracy and the scheme to defraud:

36.    ABREU, OLIVEIRA, and other conspirators obtained victims' driver's license information, including by purporting to verify the victims' ages when delivering alcohol to them for the Delivery Companies, even though none of the companies actually required drivers to photograph or scan the front of driver's licenses when making alcohol deliveries.

37.    ABREU, OLIVEIRA, and other conspirators took photographs of the front, and sometimes the back, of the victims' licenses, and sent the images to other conspirators, including BARBOSA, for use in creating fraudulent driver accounts.

38.    BARBOSA and other conspirators paid ABREU, OLIVEIRA, and others approximately $30 to $50 per license, if the license was successfully used to open a fraudulent account.   For example:

a.  Between in or about October 2020 and in or about January 2021, ABREU sent BARBOSA more than 90 driver's license images via WhatsApp or text message.

    b. Between in or about November 2020 and in or about January 2021, OLIVEIRA sent BARBOSA more than 75 driver's license images via WhatsApp or text message.

39.    AGUIAR, CABRAL, GUIMARAES NETO, PRADO, and other conspirators procured additional driver's licenses from other sources, including other conspirators.

    a. For example, on or about November 1, 2019, GUIMARAES NETO asked AGUIAR to obtain four driver's licenses for him.

40.    AGUIAR, BARBOSA, DA SILVEIRA, PRADO, ALVES NETO, SOUSA CORREA, WANDERLEY JUNIOR, CC-1, and other conspirators procured the Social Security numbers of the victims whose driver's licenses had been fraudulently obtained by purchasing them on the DarkNet or from other sources, including from other conspirators.   For example:

    a. On or about November 18, 2019, BARBOSA asked ABREU, via WhatsApp, to teach her how to buy Bitcoin—a form of cryptocurrency that is difficult to trace—after she discovered a website to purchase Social Security numbers that required payment in Bitcoin.

    b. On or about November 24, 2019, SOUSA CORREA sent AGUIAR, via WhatsApp, an image of a driver's license for Victim 1, with a driver's license number ending in 7925, for which SOUSA CORREA requested the corresponding Social Security number.

    c. On or about the same date, AGUIAR agreed, in substance, to ask his source to procure the victim's Social Security number for SOUSA CORREA.

d. In or about December 2019, CC-1 obtained Social Security numbers of victims identified by DA SILVEIRA.

e. On or about January 13, 2020, AGUIAR sent victims' driver's licenses to SOUSA CORREA via WhatsApp so that SOUSA CORREA could obtain the Social Security numbers for those victims.

f. On or about the same date, SOUSA CORREA forwarded the victim licenses to another individual to procure the victims' Social Security numbers for AGUIAR.

g. In or about February 2020, PRADO sent victims' driver's licenses to AGUIAR via WhatsApp.

h. AGUIAR, in return for payment from PRADO, thereafter asked his source to find the corresponding Social Security numbers, which he then sent to PRADO.

i. In or about June 2020, PONCIANO sent BARBOSA nine victims' driver's license images via WhatsApp.

j. BARBOSA thereafter replied by providing PONCIANO with the Social Security numbers of the nine victims.

k. In or about October 2020, WANDERLEY JUNIOR asked CC-1 to procure Social Security numbers for WANDERLEY JUNIOR and BARBOSA.

11

l.   On or about October 29, 2020, BARBOSA sent WANDERLEY JUNIOR, via
WhatsApp, a photo of her computer opened to a DarkNet site where
BARBOSA was looking for the Social Security number of a victim.

41.   AGUIAR, PRADO, ALVES NETO, SOUSA CORREA, and other conspirators
shared information about sources for Social Security numbers and the cost to purchase Social
Security numbers.   For example:

a.   On or about October 30, 2019, GUIMARAES NETO asked AGUIAR, via
WhatsApp, whether AGUIAR was using the same source for Social Security
numbers that GUIMARAES NETO was using, and whether they were paying
the same price.

b.   On or about December 27, 2019, SOUSA CORREA offered to provide
AGUIAR with Social Security numbers at a better price than what AGUIAR
was paying his existing source.

c.   In or about January 2020, ALVES NETO asked AGUIAR to procure Social
Security numbers for him, based on information ALVES NETO had received
from PRADO and DA SILVA regarding the price AGUIAR charged to
procure Social Security numbers.

42.   Once they had procured victims' identifying information, the conspirators shared
the information with one or more conspirators.   For example:

a.   On or about October 22, 2019, CC-2 notified AGUIAR via WhatsApp that he
had obtained more than 50 driver's licenses and shared a photograph of a

printout containing victims' names, dates of birth, addresses, and driver's

license numbers with AGUIAR.

    b.  On or about November 9, 2020, CABRAL sent BARBOSA, via WhatsApp, a

        list of victim names, addresses, dates of birth, and Social Security numbers.

43.    PLACIDO, SOUSA CORREA, and other conspirators edited victims' driver's

license images by substituting photos of the drivers renting or purchasing fraudulent accounts for

the victims' photos in order to circumvent facial recognition technology the Rideshare/Delivery

Companies utilized as a security measure.   For example:

    a.  Between in or about October 16, 2019 and November 8, 2019, AGUIAR sent

        GUIMARAES NETO approximately 20 passport-style photos of drivers and

        images of victim's driver's licenses.

    b.  GUIMARAES NETO thereafter sent AGUIAR images of altered licenses

        featuring the photos of drivers who were renting or purchasing fraudulent

        accounts in place of the victims' photos.

    c.  On or about February 20, 2020, SOUSA CORREA sent AGUIAR, via

        WhatsApp, photos of licenses he had edited.

    d.  On or about the same date, AGUIAR instructed SOUSA CORREA about the

        orientation and shading of the edited licenses in these photos.

    e.  On or about January 29, 2021, PLACIDO sent BARBOSA, via WhatsApp, a

        photo of his computer, opened to a photo editing application, with an image of

        a victim's driver's license displayed, but with PLACIDO's face edited into the

license.   PLACIDO asked BARBOSA, in substance, if she thought the image

would pass the background check process for Delivery Company E.

44.     AGUIAR, BARBOSA, SOUSA CORREA, and other conspirators shared driver's

license templates for use in editing victims' driver's licenses.   For example:

    a.   In or about March 2020, BARBOSA emailed AGUIAR a template of a

       Connecticut driver's license.

    b.   AGUIAR shared the template he received from BARBOSA with another

       conspirator.

    c.   On or about February 15, 2020, SOUSA CORREA notified AGUIAR via

       WhatsApp that he was having a template of a Massachusetts driver's license

       made and asked AGUIAR to take a high-quality photo of a Massachusetts

       driver's license for SOUSA CORREA to use in the template.

45.     In some instances, the conspirators attempted to open fraudulent driver accounts

for drivers who looked like the victims whose driver's licenses the conspirators fraudulently

obtained.

46.     One or more conspirators edited insurance documents and other materials

submitted to the Rideshare/Delivery companies to reflect that the victim names in which

accounts were opened were covered by automobile insurance, when in fact, they were not.   For

example:

    a.   In or about October 2019, AGUIAR asked CC-2 via WhatsApp to alter an

       insurance policy document so that it listed a different vehicle.

14

    b.  CC-2 responded to AGUIAR with an image of an insurance policy document listing the vehicle AGUIAR had specified.

    c.  On or about February 20, 2020, AGUIAR sent SOUSA CORREA a template for vehicle insurance.

47.    AGUIAR, BARBOSA, CABRAL, PLACIDO, RAMOS, DA SILVEIRA, PRADO, ALVES NETO, DA SILVA, SOUSA CORREA, DA FONSECA, WANDERLEY JUNIOR, PONCIANO, and other conspirators applied for driver accounts with the Rideshare/Delivery Companies using the fraudulently obtained driver's licenses, Social Security numbers and the fraudulent insurance documentation. For example:

    a.  On or about November 23, 2019, AGUIAR opened a fraudulent driver account with Rideshare Company A.

    b.  On or about April 10, 2019, April 11, 2019, and November 21, 2019, BARBOSA opened fraudulent accounts with multiple Rideshare/Delivery Companies.

    c.  On or about October 25, 2019 and October 28, 2019, CABRAL and BARBOSA communicated via WhatsApp about the fact that Rideshare/Delivery Companies had approved fraudulent accounts they had opened.

    d.  In or about December 2019, April 2020, September 2020, and October 2020, ALVES NETO opened fraudulent driver accounts with Rideshare Company A.

    e.  On or about March 5, 2020 and in or about October 2020, PRADO opened fraudulent driver accounts with Rideshare Company A.

    f.  On or about April 10, 2020, PLACIDO communicated with BARBOSA via WhatsApp about dozens of fraudulent driver accounts they had created.

48.    BARBOSA, CABRAL, and other conspirators used information pulled from victims' driver's licenses and Social Security numbers to circumvent identity verification questions that the Rideshare/Delivery Companies required.   For example:

    a.  On or about November 8, 2019 and November 10, 2019, CABRAL sent BARBOSA, via WhatsApp, images of identity verification questions from one of the Rideshare/Delivery Companies that he needed to answer to continue setting up fraudulent driver accounts in various victims' names.

    b.  BARBOSA responded by asking CABRAL to send her the victims' driver's licenses and Social Security numbers.

    c.  Using this information, BARBOSA provided the responses to the identity verification questions to CABRAL.

49.    AGUIAR, BARBOSA, CABRAL, PLACIDO, ALVES NETO, SOUSA CORREA, PEREIRA, DA FONSECA, and other conspirators advertised fraudulent drivers' accounts to potential drivers, including via WhatsApp chat groups targeted to Brazilian nationals living in the United States and via word of mouth.   For example:

a. On or about October 29, 2019, BARBOSA communicated with CABRAL via WhatsApp about a fraudulent account for a female driver with Delivery Company B, which CABRAL said he would advertise.

b. On or about November 13, 2019, SOUSA CORREA referred BRAGA to AGUIAR for the purpose of obtaining fraudulent accounts.

c. On or about November 14, 2019, AGUIAR sent BRAGA the log-in and registration information for an account he created in the name of Victim 2 and a photograph of Victim 2's driver's license, with a driver's license number ending in 3083.

d. In or about November 2019, DA FONSECA sent BARBOSA several drafts of an advertisement to potential drivers for BARBOSA to edit.

e. On or about April 11, 2020, PLACIDO sent the contact information of a driver looking for an account with Delivery Company E to BARBOSA.

f. On or about April 20, 2020 and on or about September 24, 2020, AGUIAR posted a message in a WhatsApp group chat that he had male and female accounts with Delivery Company D for a "good price."

g. On or about April 25, 2020, SOUSA CORREA referred a potential driver looking for an account with Delivery Company E to AGUIAR.

h. On or about September 10, 2020, ALVES NETO posted in a WhatsApp group chat that he had a delivery account available in the Worcester, Massachusetts area.

50.     AGUIAR, BARBOSA, RAMOS, DA SILVEIRA, PEREIRA, WANDERLEY JUNIOR, CC-2, and other conspirators managed the fraudulent driver accounts by collecting rental payments from drivers and troubleshooting issues that arose with the fraudulent accounts. For example:

      a.   On or about October 17, 2019, AGUIAR sent CC-2 a photograph showing that a driver had been asked for a Social Security number while attempting to log into a Rideshare/Delivery app.

      b.   CC-2 replied to AGUIAR with a photograph identifying a Social Security number for the driver to use.

      c.   Beginning in or about November 2019, PEREIRA sent AGUIAR multiple photos of potential drivers.

      d.   AGUIAR created fraudulent driver accounts using the photos.

      e.   PEREIRA communicated with AGUIAR when one of the drivers for whom AGUIAR had created an account was late in paying the rent for the account.

      f.   DA FONSECA directed individuals to BARBOSA for account rentals and forwarded their names and bank account information to BARBOSA to use in creating accounts.

51.     AGUIAR, BARBOSA, CABRAL, RAMOS, DA SILVEIRA, ALVES NETO, DA SILVA, GUIMARAES NETO, SOUSA CORREA, BRAGA, ABREU, OLIVEIRA, DA FONSECA, and other conspirators received payments from the Rideshare/Delivery Companies for accounts created in victims' names.   For example:

a. Between June 2019 and January 2021, AGUIAR caused the Rideshare/Delivery Companies to deposit payments into his bank account representing the earnings on accounts in at least 22 different names.

b. Between June 2019 and January 2021, BARBOSA caused the Rideshare/Delivery Companies to deposit payments into her bank account representing the earnings on accounts in at least 68 different names..

c. Between June 2019 and January 2021, CABRAL caused the Rideshare/Delivery Companies to deposit payments into his bank account representing the earnings on accounts in at least 2 different names.

d. Between April 2019 and December 2020, RAMOS caused the Rideshare/Delivery Companies to deposit payments into her bank account representing the earnings on accounts in at least 53 different names.

e. Between June 2019 and December 2020, DA SILVEIRA caused the Rideshare/Delivery Companies to deposit payments into his bank account representing the earnings on accounts in at least 37 different names.

f. Between July 2019 and January 2021, ALVES NETO caused the Rideshare/Delivery Companies to deposit payments into his bank account representing the earnings on accounts in at least 3 different names.

g. Between June 2019 and December 2020, DA SILVA caused the Rideshare/Delivery Companies to deposit payments into his bank account representing the earnings on accounts in at least 14 different names.

h.  Between January 2019 and February 2021, GUIMARAES NETO caused the Rideshare/Delivery Companies to deposit payments into his bank account representing the earnings on accounts in at least 31 different names.

i.  Between June 2019 and March 2021, SOUSA CORREA caused the Rideshare/Delivery Companies to deposit payments into his bank account representing the earnings on accounts in at least 47 different names.

j.  Between June 2019 and December 2020, BRAGA caused the Rideshare/Delivery Companies to deposit payments into his bank account representing the earnings on accounts in at least 32 different names.

k.  Between January 2019 and December 2020, ABREU caused the Rideshare/Delivery Companies to deposit payments into his bank account representing the earnings on accounts in at least 18 different names.

l.  Between January 2019 and December 2020, OLIVEIRA caused the Rideshare/Delivery Companies to deposit payments into his bank account representing the earnings on accounts in at least 20 different names.

m.  Between March 2019 and December 2020, DA FONSECA caused the Rideshare/Delivery Companies to deposit payments into his bank account representing the earnings on accounts in at least 25 different names.

52.  BARBOSA, CABRAL, PLACIDO, RAMOS, DA SILVEIRA, and other conspirators collected referral bonuses from the Rideshare/Delivery Companies for fraudulent driver accounts they created.   For example:

a.  On or about October 31, 2019, CABRAL and BARBOSA discussed, via WhatsApp, opening a fraudulent driver account using a referral code for Rideshare Company C and splitting the referral bonus.

b.  On or about November 6, 2019, BARBOSA sent CABRAL, via WhatsApp, a screenshot showing a list of fraudulent driver accounts BARBOSA and CABRAL had referred to Rideshare Company C and their progress toward earning the referral bonus.

c.  On or about December 9, 2019, BARBOSA created a fraudulent driver account in the name of a victim solely for the purpose of referring other drivers and collecting a referral bonus from Delivery Company D.   Between in or about January 2020 through in or about May 2020, BARBOSA received approximately $43,500 in referral bonuses through this account.

d.  On or about December 23, 2019, BARBOSA sent DA FONSECA, via WhatsApp, images of Delivery Company D's app opened to the referral page, showing delivery progress and referral bonus amounts for various names under which they had opened fraudulent driver accounts.

e.  On or about January 7, 2020, BARBOSA notified RAMOS via WhatsApp that she was sharing $450 from a referral bonus for one of the Rideshare/Delivery Companies with her.

f.  On or about April 9, 2020, PLACIDO offered, via WhatsApp, to sell BARBOSA information about which zip code to use when creating a

21

fraudulent driver account to obtain the highest referral bonus and a referral
link through Delivery Company D.

g.  BARBOSA purchased the zip code information and link from PLACIDO for
$1,000.

h.  On or about August 21, 2020, BARBOSA shared an image with CABRAL,
PLACIDO, RAMOS, DA SILVEIRA, and CC-1 showing that they had
received approximately $194,800 in referral bonuses from Delivery Company
D in connection with 487 referrals based on fraudulent driver accounts.

53.     AGUIAR, BARBOSA, CABRAL, PLACIDO, RAMOS, DA SILVEIRA,
PRADO, SILVA, SOUSA CORREA, BRAGA, PEREIRA, DA FONSECA, WANDERLEY
JUNIOR, and other conspirators exchanged information about how to circumvent the
Rideshare/Delivery Companies' fraud detection systems.   For example:

a.  In or about November 2019, AGUIAR gave GUIMARAES NETO tips about
how to manipulate the angles from which the photographs were taken in order
for Rideshare Company A to accept them.

b.  On or about December 9, 2019, SOUSA CORREA shared a tip about taking a
picture of a picture to get past Rideshare Company C's fraud detection
system.

c.  On or about January 19, 2020, SOUSA CORREA instructed AGUIAR to
apply for accounts via Rideshare Company C's website, as opposed to its app,
for better results.

54.     BARBOSA, CABRAL, PLACIDO, RAMOS, DA SILVEIRA, CC-1, and other conspirators purchased a "bot" for the purpose of "cutting the line" to grab batches of deliveries on Delivery Company E's app, and also so that they could sell the "bot" to drivers who purchased or rented fraudulent accounts from them.

55.     PRADO, SOUSA CORREA, and other conspirators purchased GPS "spoofing" applications that allowed drivers to "cut the line" for rides or deliveries, or to make trips appear longer than they actually were, and sold this technology to drivers.   For example:

      a.  In or about December 2019, SOUSA CORREA sent AGUIAR a photograph of a GPS "spoofing" application he had purchased, and subsequently instructed AGUIAR about how the application worked.

      b.  On or about February 23, 2020, PRADO told AGUIAR, in substance, that he had obtained a GPS "spoofing" application to make rides appear longer than they were, in order to secure a higher fare, and that he was selling the "spoofing" app to drivers.

56.     AGUIAR, BARBOSA, CABRAL, PRADO, BRAGA, WANDERLEY JUNIOR, and other conspirators shared information about, among other things, editing driver's licenses and securing Social Security numbers.   For example:

      a.  On or about November 25, 2019, BARBOSA and CABRAL discussed the name of a contact who could edit licenses for them.

b.  In or about October 2019, CC-1 sent GUIMARAES NETO's contact

information to AGUIAR and identified GUIMARAES NETO as someone

who could edit driver's licenses.

c.  On or about November 21, 2019, BRAGA told AGUIAR via WhatsApp that

he had a contact who would edit driver's licenses for AGUIAR for $30 each.

d.  In or about March 2020, PRADO referred another individual to AGUIAR as

someone who could edit driver's licenses for him.

24

<u>COUNT ONE</u>
Conspiracy to Commit Wire Fraud
(18 U.S.C. § 1349)

The Grand Jury charges:

57.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-56 of this Superseding Indictment.

58.    From in or about January 2019 through in or about April 2021, in the District of Massachusetts and elsewhere, the defendants,

(1)   WEMERSON DUTRA AGUIAR,
(2)   PRISCILA BARBOSA,
(3)   EDVALDO ROCHA CABRAL,
(4)   CLOVIS PLACIDO,
(5)   BRUNA PEIXOTO COLAÇO RAMOS,
(6)   GUILHERME DA SILVEIRA,
(7)   THIAGO DE SOUZA PRADO,
(8)   LUIZ NARCISO ALVES NETO,
(9)   FLAVIO CANDIDO DA SILVA,
(10)  ALTACYR DIAS GUIMARAES NETO,
(11)  ITALLO FELIPE PEREIRA DE SOUSA CORREA,
(12)  JULIO VIEIRA BRAGA,
(13)  PHILIPE DO AMARAL PEREIRA,
(14)  BRUNO PROENCIO ABREU,
(15)  OLIVER FELIPE GOMES DE OLIVEIRA,
(16)  ALESSANDRO FELIX DA FONSECA,
(17)  WALDEMY JORGE LIMA WANDERLEY JUNIOR, and
(18)  SAULO AGUIAR PONCIANO,

conspired with one another, and with others known and unknown to the Grand Jury, to commit wire fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, to transmit and cause to be transmitted, by means of wire communications in

interstate and foreign commerce, writings, signs, signals, pictures and sounds, for the purpose of executing the scheme to defraud, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1349.

COUNT TWO
Aggravated Identity Theft
(18 U.S.C. § 1028A(a)(1))

The Grand Jury further charges:

59.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-56 of this Superseding Indictment.

60.     On or about November 24, 2019, in the District of Massachusetts and elsewhere, the defendant,

(11) ITALLO FELIPE PEREIRA DE SOUSA CORREA,

did knowingly transfer, possess, and use, without lawful authority, a means of identification of another person, that is, the name and driver's license number (ending in 7925) of Victim 1, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349.

All in violation of Title 18, United States Code, Section 1028A(a)(1).

<u>COUNT THREE</u>
Aggravated Identity Theft
(18 U.S.C. § 1028A(a)(1))

The Grand Jury further charges:

61.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-56 of this Superseding Indictment.

62.     On or about November 14, 2019, in the District of Massachusetts and elsewhere, the defendant,

(12) JULIO VIEIRA BRAGA,

did knowingly transfer, possess, and use, without lawful authority, a means of identification of another person, that is, the name and driver's license number (ending in 3083) of Victim 2, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349.

All in violation of Title 18, United States Code, Section 1028A(a)(1).

FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

63.     Upon conviction of the offense in violation of Title 18, United States Code, Section

1349, set forth in Count One, the defendants,

      (1)   WEMERSON DUTRA AGUIAR,
      (2)   PRISCILA BARBOSA,
      (3)   EDVALDO ROCHA CABRAL,
      (4)   CLOVIS PLACIDO,
      (5)   BRUNA PEIXOTO COLAÇO RAMOS,
      (6)   GUILHERME DA SILVEIRA,
      (7)   THIAGO DE SOUZA PRADO,
      (8)   LUIZ NARCISO ALVES NETO,
      (9)   FLAVIO CANDIDO DA SILVA,
      (10)  ALTACYR DIAS GUIMARAES NETO,
      (11)  ITALLO FELIPE PEREIRA DE SOUSA CORREA,
      (12)  JULIO VIEIRA BRAGA,
      (13)  PHILIPE DO AMARAL PEREIRA,
      (14)  BRUNO PROENCIO ABREU,
      (15)  OLIVER FELIPE GOMES DE OLIVEIRA,
      (16)  ALESSANDRO FELIX DA FONSECA,
      (17)  WALDEMY JORGE LIMA WANDERLEY JUNIOR, and
      (18)  SAULO AGUIAR PONCIANO,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C),

and Title 28, United States Code, Section 2461(c), any property, real or personal, which

constitutes or is derived from proceeds traceable to the offense.

64.     If any of the property described in Paragraph 63, above, as being forfeitable

pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code,

Section 2461(c), as a result of any act or omission of the defendants --

      a.   cannot be located upon the exercise of due diligence;

      b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property

of the defendant up to the value of the property described in Paragraph 63 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United

States Code, Section 2461(c).

A TRUE BILL

_____
FOREPERSON

KRISTEN A. KEARNEY
DAVID M. HOLCOMB
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF MASSACHUSETTS

District of Massachusetts: June ___14___, 2021
Returned into the District Court by the Grand Jurors and filed.

/s/ Noreen A. Russo
_____
DEPUTY CLERK

30

at 2:00 PM